UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at ASHLAND

CIVIL ACTION NO. 09-58-GWU

JANET ROSE COFFEE, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation process in assessing whether a claimant is disabled.

1. Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2. If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities? If not, a finding of non-disability is made and the claim is denied.

1


3. The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments). If so, disability is conclusively presumed and benefits are awarded.

4. At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work. If so, the claimant is not disabled and the claim is denied. If the plaintiff carries this burden, a prima facie case of disability is established.

5. If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim.  <u>Bowie v. Secretary</u>, 679 F.2d 654, 656 (6th Cir. 1982).  This presumes, of course, that the treating physician's opinion is based on objective medical findings.  <u>Cf. Houston v. Secretary of Health and Human Services</u>, 736 F.2d 365, 367 (6th Cir. 1984); <u>King v. Heckler</u>, 742 F.2d 968, 973 (6th Cir. 1984).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary.  <u>Hardaway v. Secretary</u>, 823 F.2d 922 (6th Cir. 1987).  These have long been well-settled principles within the Circuit.  <u>Jones</u>, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain.  Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms.  20 C.F.R. § 404.1529 (1991).  However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category

if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. § 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance

on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Janet Rose Coffee, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of smoker's shortness of breath and bronchitis, degenerative disc pathology of the lumbar spine, hypothyroidism, farsightedness, a borderline IQ, and a depressive disorder mixed with panic features. (Tr. 19). Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that Mrs. Coffee retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits. (Tr. 23-7). The Appeals Council declined to review, and this action followed.

At an administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age of 51, with a ninth grade education and work experience as a grill cook, could perform any jobs if she were capable of "light" level exertion, with the ability to stand for four hours in an eight-hour day (no more than one hour without interruption) and sit four to six hours (no more than two hours without interruption), and also had the following non-exertional restrictions. She: (1) could occasionally bend, stoop, crouch, squat, kneel, crawl and climb stairs, steps, and ramps; (2)

7

should not perform sustained or frequent overhead work, climb hills or slopes, work on uneven terrain, climb high ladders or walk at unprotected heights, operate mobile equipment or otherwise be exposed to jarring, jostling, or jolting, or perform commercial driving; (3) should not be exposed to excessive air pollutants, pulmonary irritants, allergens, temperature extremes, or damp, humid conditions; (4) should be permitted to wear eyeglasses as desired; (5) had a fair ability to understand, remember, and follow instructions, maintain attention to perform simple, repetitive tasks and relate to other people; (6) had a poor ability to tolerate the stress and pressure associated with day-to-day work activity; and (7) was limited to simple, routine, or repetitive task-oriented jobs in low stress work environments that did not involve interaction with the general public. (Tr. 276-7). The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the regional and national economies. (Tr. 277-8).

On appeal, this court must determine whether the administrative decision is supported by substantial evidence. There is an additional issue in that the plaintiff's Date Last Insured (DLI) for the purposes of her DIB application was September 30, 2005 (Tr. 17, 61), meaning that she had to establish disability prior to this date in order to be eligible for benefits. Her SSI application is not affected.

The plaintiff alleged disability beginning January 1, 2003 due to a chemical imbalance, nervousness, agitation, feeling "really bothered" in a crowd, and memory problems.  (Tr. 84).  She reported that January 1, 2003 was the date of her first "nervous breakdown" and she could not work after that.  (Id.).

The plaintiff does not challenge the ALJ's physical findings on appeal, but does raise two issues regarding the ALJ's evaluation of her mental impairments under the Commissioner's Listings of Impairment (LOI).

First, Mrs. Coffee asserts that the ALJ erred in failing to find that she met the requirements of LOI 12.04C.  LOI 12.04 is captioned "Affective disorders," which are defined as being "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  LOI 12.04C provides, in pertinent part, that an individual will be found disabled if she can show a "[m]edically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and . . . [r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt P., App. 1 § 12.04C.[1]

---

[1] "Episodes of decompensation are exacerbations or  temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace . . . demonstrated by exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful

The ALJ stated in his decision that he considered the criteria of Listing 12.04 but concluded that Mrs. Coffee did not satisfy the criteria in "paragraph B" or "paragraph C." (Tr. 22).[2] The plaintiff asserts that she did have repeated episodes of decompensation, but evidence that she meets the Listing is lacking.

Mrs. Coffee informed a consultative psychological examiner, Dr. Stuart Cooke, that her problems had dated to 1998 or 1999, when she decided she "didn't want to live anymore," and sought treatment at the Pathways mental health clinic. (Tr. 219).  She alleged that she had made a suicide attempt by taking an overdose, and was psychiatrically hospitalized for a week.  She stated that she had been hospitalized twice at the Behavioral Medicine Unit at Pathways, most recently in "1989." (Id.).  She added that she was "not good with dates." (Id.).  Her husband, who was present at the interview, informed Dr. Cooke that Mrs. Coffee had been psychiatrically hospitalized three times.  (Tr. 220).  She had attempted to go back to work but experienced episodes of shakiness, tachycardia, and difficulty breathing. (Tr. 219).  She did not have these episodes on her medications, which included Effexor and Xanax.  (Tr. 219-20). She stated that if she did not take her medication she would end up back in the hospital.  (Tr. 220).  Otherwise, she described fairly

---

situation (or a combination of the two)." 20 C.F.R. Subpt. P, App. 1 12.00C(4) (2009).

[2]The plaintiff does not assert that she meets the "B" criteria.

normal daily activities including household chores, sometimes meeting with friends, going to church, and attending church activities.  (Id.).

There is no evidence of any hospitalizations in the other medical records.  An inquiry from the state agency to Pathways was unsuccessful as the agency reported that the plaintiff's records had been destroyed.  (Tr. 188).  Although Mrs. Coffee told Dr. Rita Ratliff that one or more of her hospitalizations had been at King's Daughters' Hospital (Tr. 223), records from King's Daughters' show only an admission for syncope "with altered mental status" secondary to a motor vehicle accident in 2006 (Tr. 152-6), and a brief admission for complaints of chest pain in October, 2007 (Tr. 257-9).  No functional restrictions were assessed on either occasion, and the plaintiff was said to be alert and oriented on discharge and capable of normal activity.

The plaintiff objects to the ALJ's inference that because no mental health records were available her symptoms were under control.  (Tr. 24).  However, it is the plaintiff's responsibility to prove her own case, and in particular, to prove that she meets or equals all of the requirements of a Listing.  Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990).  Not only is there no evidence of the extensive psychiatric treatment described by the plaintiff, state agency reviewing psychologists Ed Ross and M. Allen Dawson were able to review most of the medical evidence and specifically found that the evidence did not establish the presence of the "C" criteria

of LOI 12.04.  (Tr. 234, 240).  State agency psychological consultants are considered "highly qualified" under the Commissioner's regulations, 20 C.F.R.  §§ 404.1527(f)(2)(i); 416.927(f)(2)(i), and, even though their opinions are not binding on the ALJ, they provide substantial evidence to support his decision, particularly in the absence of any contrary evidence from other medical professionals.  Accordingly, this argument is without merit.

The plaintiff's second argument is that the ALJ failed to consider whether she met or equaled the requirements of LOI 12.05C for mental retardation.  Dr. Cooke, the consulting psychologist, reported a verbal IQ of 71, a performance IQ of 69, and a full-scale IQ of 69. (Tr. 221). The ALJ noted these scores but found that the plaintiff had borderline intellectual functioning.  (Tr. 20).

LOI 12.05 states, in pertinent part, that:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

The introductory paragraph to § 12.05 states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially

manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

Clearly, although Dr. Cooke only diagnosed "rule out" mental retardation (Tr. 222), the IQ scores he obtained are within the range contemplated by the Listing. However, the Sixth Circuit Court of Appeals has found that the impairment must satisfy the diagnostic description in the introductory paragraph of 12.05C. Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001). The evidence in the present case does not establish either significantly subaverage intellectual functioning prior to age 22, or any significant deficits in adaptive functioning.

In Foster, the plaintiff had several IQ scores between 68 and 70, but the Sixth Circuit held that the fact the plaintiff had left school after the ninth grade did not, by itself, establish significantly subaverage intellectual functioning prior to age 22. Id. at 355. In the present case, the plaintiff dropped out of school after the ninth grade, but she stated that this was because she needed to help her mother. (Tr. 269). She did not even allege that she had difficulty in school, much less provide any school records or other contemporaneous evidence. The plaintiff correctly states that the regulations do not require contemporaneous evidence from before age 22. See 60 Fed. Reg. 50,746, 50,754, 2000 WL 1173632 (August 21, 2000). The Commissioner is permitted "to use judgment, based on current evidence, to infer when the impairment began." Id. There is little current evidence of the plaintiff functioning in the mentally retarded range at any time, however. Dr. Cooke's testing

showed that she has a high school reading level. (Tr. 221). The ALJ concluded that the IQ scores were of dubious reliability due to her reading ability. Again, the plaintiff questions this conclusion, but it is not facially unreasonable for the ALJ to question the wide gap between the reported IQ scores and demonstrated reading ability. The regulations do not limit the question of validity to the test scores alone and the ALJ may consider other factors in determining whether they are representative of a claimant's intelligence. McDonald v. Secretary of Health and Human Services, 796 F.2d 1165, 1986 WL 16598 (6th Cir. Feb. 25, 1986) (unpublished disposition).

The plaintiff's main argument concerning adaptive functioning is that her confusion about dates establishes deficits in adaptive functioning. She assigns significance to a state agency interviewer's observation at the time of her DIB application that she had some problems concentrating and was slow to answer questions, but this is of limited significance as another employee at the reconsideration level a few months later noted no problems and described her as alert and cooperative. The plaintiff told Dr. Cooke that she was able to take care of her personal needs, could dial a phone, drive a car, read a newspaper, and attend church and church functions. (Tr. 220). The plaintiff stated at the time of her applications that she was able to take care of her granddaughter and her pet dog, cook, follow written instructions such as a recipe, and do laundry. (Tr. 97-103). The

ability to do these activities might not be conclusive, but under the facts of this case the ALJ could reasonably have found that the plaintiff functioned in the borderline range of intelligence.

    The decision will be affirmed.

    This the 28th day of May, 2010.

**Signed By:**

**G. Wix Unthank**

**United States Senior Judge**